IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 26, 2014

## MICHAEL DANIELS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 283732     Rebecca J. Stern, Judge**

_____

**No. E2013-01478-CCA-R3-PC - Filed June 26, 2014**

_____

The Petitioner, Michael Daniels, appeals the Hamilton County Criminal Court's denial of post-conviction relief from his convictions for first degree murder and conspiracy to commit first degree murder. On appeal, the Petitioner argues that he received ineffective assistance of counsel. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Amanda B. Dunn, Chattanooga, Tennessee, for the Petitioner-Appellant, Michael Daniels.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, District Attorney General; and Neal Pinkston, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from the shooting death of the victim, Adrian "A.D." Patton, on June 13, 2006, in Chattanooga, Tennessee. As a result, the Petitioner and his co-defendant, Timothy Evans, were each indicted by the Hamilton County Grand Jury for first degree murder, conspiracy to commit first degree murder, and carrying a dangerous weapon. Sometime prior to the victim's death, someone shot at the Petitioner's sister's apartment building, and the Petitioner believed the victim was responsible. A meeting was arranged between the victim and the Petitioner, at which the victim explained that he was not involved in the shooting. During the meeting, a witness heard the Petitioner tell Evans to "handle it." In response, Evans shot and killed the victim. The State's theory of the case was that the Petitioner held a high rank in a gang and ordered Evans to kill the victim. Evans admitted

that he was in the same gang as the Petitioner, that the Petitioner held a higher rank than him, and that he shot the victim because he was ordered to do so by the Petitioner. The following evidence, in pertinent part, was presented at a joint trial:

At trial, Investigator Christina Young testified as an expert in gang activity that she worked for the Silverdale Detention Center as a gang investigator. As part of her duties, she was responsible for identifying inmates with gang affiliations and managing those inmates. She explained that gangs were a security threat for the detention center's employees and inmates not affiliated with gangs and that she interviewed every inmate within seventy-two hours of the inmate's arrival at the facility. She described how gangs such as the Crips and Bloods originally formed in California and said the first documented Bloods gang was named the Piru Street Gang because the founder lived on Piru Street. She said that members of the Bloods often used "Piru" as another word for "friend" and that the ranking structure within the Bloods was as follows, from highest rank to lowest: O.G., original gangster; Y.O.G., young original gangster; Y.G., young gangster; B.G., baby gangster for children eight to twelve years old; and soldiers, young aspiring gang members "out doing the majority of the work." Investigator Young explained that "set gangs" were local versions of the large gangs and that the Skyline Bloods and East L Treetop Piru Bloods were Chattanooga set gangs under the Bloods. She said that each gang usually claimed a particular area as its territory and that lower gang members wanted to impress their O.G.

On cross-examination, Investigator Young testified that the Skyline Bloods had about thirty-five members and that members used "Piru" as another word for "Blood." She stated that a B.G. would do what he or she was told and that a Y.G. would have a small amount of status over a B.G. but still would have to answer to the O.G., who was the boss. She said an O.G. gave orders to lower ranking members and usually did not participate in carrying out criminal activity. If a gang member did not follow an O.G.'s orders, the member could be disciplined with punishment ranging from physical assault to death.

Officer Matthew A. Hennessy of the Chattanooga Police Department testified as a gang expert that he used to patrol "southside" Chattanooga, which encompassed the Emma Wheeler Homes housing development, Alton Park, St. Elmo, and Tiftonia. He said the Skyline Bloods were in the southside area while the Crips and Gangster Disciples were in the East Lake Courts area.

On cross-examination, Officer Hennessy testified that the [Petitioner and Evans] were members of the Skyline Bloods. He said that Evans was a B.G. in the gang and that it was his "understanding" from investigations and talking with gang members that [the Petitioner] was a Y.G. He said O.G.s and Y.G.s were the "shot-callers" and could order that a lower-ranking gang member be fined, physically assaulted, ordered to harm a rival gang, shot, or killed if the member did not follow a leader's orders. He said that Delicia Woodruff, Frederico Brock, and Darius Sneed were "associates" of the Skyline Bloods and that he knew the victim to associate with the Crips-based gangs in East Lake Courts. Officer Hennessy said he thought [the Petitioner] was the current leader of the Skyline Bloods.

. . . .

[Frederico "Puerto Rico" Brock] testified that he did not remember telling Sergeant Scott Bales that [the Petitioner] was the O.G. for the Skyline Bloods. He said, "The word is he is an O.G. I don't know for sure whether he is an O.G." When asked what would happen to a person who did not follow an O.G.'s order, Brock said, "Man, s---, they'd get killed. Something happen to them." He said that although he claimed in his June 20 statement to police that [the Petitioner's] gun was "showing" just before the shooting, [the Petitioner] did not have a gun. Brock said he was high when he gave his June 20 statement. He said he was not scared for himself but was scared for his family and children. He said that he had received threats but that "the truth is the truth."

. . . .

Darius Sneed testified that he was the victim's first cousin and that he was affiliated with the Athens Park Bloods. He said that he did not "hang" with the victim but that they were close. He said that [the Petitioner] claimed to be the O.G. of the Skyline Bloods when [the Petitioner] was actually only a Y.G. and that [the Petitioner] gave Evans "some fake Y.G. status."

. . . .

Sneed testified that he saw [the Petitioner] holding a silver gun before the shooting but that he did not see [the Petitioner] shoot. He said that he did

not hear [the Petitioner] say anything to Evans before the shooting but that Brock told Sneed, "[T]hat boy told dude to do that."

. . . .

On cross-examination, Sneed testified that the victim came to Emma Wheeler Homes on June 13 to talk with [the Petitioner] but that the victim was not looking for trouble and wanted to clear up misinformation about the shooting at [the Petitioner's] sister's house. Sneed said Timothy Sexton also might have been standing at the truck before the shooting but that he did not remember. Sneed said that he did not see Evans at the truck when Sneed first started talking with the victim but that Evans "popped up" at some point. Although Sneed did not hear [the Petitioner] tell Evans to kill the victim, Sneed said he knew [the Petitioner] gave the order because Evans did not even know the victim. About an hour after the shooting, Evans telephoned Sneed and told Sneed he was sorry for shooting the victim and did not know Sneed was the victim's cousin. Sneed asked Evans why he shot the victim, and Evans told Sneed that [the Petitioner] told him to do it. Sneed said Evans shot the victim because [the Petitioner] was "over" Evans, Evans was scared, and "something probably would have happened" to Evans if he had not carried out [the Petitioner's] order. Sneed said he did not think Evans would have shot the victim if Evans had known the victim was Sneed's cousin. He said that [the Petitioner] knew the victim was his cousin and that [the Petitioner] "did that sh-t behind my back." He said that he grew up with Brock and that Brock had no reason to lie about what Brock heard. Sneed said that he was probably high on June 13 but that "I still remember what happened. I bet you that."

. . . .

On cross-examination, [Delicia "DeeDee"] Woodruff testified that she and Sexton had been dating for two to three weeks at the time of the shooting and that Sexton was the O.G. of the Treetop Piru Bloods. [The Petitioner] had a rank in the Skyline Bloods. Woodruff did not know if he was the O.G., but [the Petitioner's] rank was higher than Evans' rank. Woodruff did not hear any of the [Petitioner's and Evans'] conversation before the shooting and did not see Evans take off his black t-shirt after the shooting. She did not know why Evans shot the victim.

. . . .

-4-

Lieutenant Edwin McPhearson of the Chattanooga Police Department testified that he knew [the Petitioner] from "working the streets" and could recognize [the Petitioner's] face and voice. Sometime after the shooting, Lieutenant McPhearson was speaking with [the Petitioner's] sister, Nicole Evans, at the police department. He received a call from the clerk in the front lobby, went to the lobby, and encountered [the Petitioner's] other sister, Shenika. She told Lieutenant McPhearson that she had [the Petitioner] on the telephone. Lieutenant McPhearson talked with [the Petitioner] and told [the Petitioner] that he needed to speak with [the Petitioner] about the investigation. He said [the Petitioner] told him, "I know who the f-ck you are." Lieutenant McPhearson told [the Petitioner] that people might stop retaliating against [the Petitioner's] family if [the Petitioner] turned himself in. He said [the Petitioner] told him, "I have a hundred soldiers standing behind me. Do your job. It's your job to find me. You come and find me." [The Petitioner] also told him, "You know who I am. I'm a killer. Do your job." A few hours later, police officers located [the Petitioner] at an apartment in Emma Wheeler Homes. The SWAT team surrounded the apartment, and [the Petitioner] spoke with Lieutenant McPhearson on the telephone again. Lieutenant McPhearson said [the Petitioner] was "humble" and asked that he not be killed. [The Petitioner] surrendered to police and came out of the apartment. Lieutenant McPhearson said that as [the Petitioner] was being put into a patrol car, [the Petitioner] yelled to the crowd, "Skyline forever."

On cross-examination, Lieutenant McPhearson testified that [the Petitioner] did not have a gun on his person when the police arrested him. He said that [the Petitioner] "put [himself] at the forefront as being the head of the Skyline gang" and that Evans was either a B.G. or a soldier. He said that if gang members did not do as they were told, they could be physically punished or assigned to commit violent crimes.

. . . .

Investigator James Tate of the Chattanooga Police Department testified that he investigated the case and interviewed [the Petitioner] on June 16. [The Petitioner] waived his rights and gave a recorded statement. The State played a redacted version of [the Petitioner's] statement for the jury, and [the Petitioner] said the following: On June 13, [the Petitioner] was in a hotel room with Woodruff and Sexton when he received a telephone call from Brock, telling him that the victim was at Emma Wheeler Homes. [The Petitioner], Woodruff, and Sexton went to the housing development. Brock was standing

-5-

outside his apartment, and the victim "pulled off." Brock telephoned the victim and told the victim to come back. [The Petitioner] said that when the victim returned, he asked the victim about the victim's shooting at Nicole Evans' house earlier in the day. [The Petitioner] said that the shooter had endangered the lives of his sister and nephew and that the victim "was trying to plead his case to me that he didn't shoot." [The Petitioner] said that Sneed was standing with him, that Sneed was listening to him and the victim talk, and that Sneed was "trying to keep peace." Brock, Woodruff, and Sexton were not close to the truck. [The Petitioner] said he heard gunfire and stepped away from the truck while Sneed "stayed there crying." Investigator Tate asked [the Petitioner], "What did you want to happen when [the victim] pulled up?" [the Petitioner] said, "I wanted him to get up on the stand and let me and him be on the same page. Cool. And he was pleading his life to me. And after that, sir, it was too late." [The Petitioner] told Investigator Tate that he did not have a gun at the shooting. He said that he was not the O.G. of the Skyline Bloods but that "I do got status." Later, he said that he was a Y.G. and that "my rank ain't high enough to kill, to get nobody killed."

. . . .

Timothy "Timboo" Evans testified on his own behalf that he was seventeen years old on June 13, 2006, and was a member of the Skyline Bloods. [The Petitioner] started the Skyline Bloods in Chattanooga and was the leader. Evans was a soldier in the gang for about one year. He became a B.G., and [the Petitioner] gave him his current Y.G. rank. He said that he did everything [the Petitioner] told him to because "I have no choice" and that he would be punished if he did not do as he was told. On the day of the shooting, Evans went to a job interview at McDonalds. As he was leaving, he ran into [the Petitioner], and [the Petitioner] told him to go to Emma Wheeler Homes. Evans took a gun with him because he did not want to leave it where he was staying and met [the Petitioner]. He had met the victim for the first time earlier in the day and did not have a problem with the victim.

Evans testified that he, [the Petitioner], Brock, and Woodruff waited for the victim to arrive. He said that he and Brock had smoked "weed" earlier but that Brock was in "stable condition." The victim arrived in the truck, and Sneed went to the truck and started a conversation with the victim. Evans said that [the Petitioner] also went to the truck and that "they started talking and having little words and stuff." Evans said he did not really listen to the men talking. He said [the Petitioner] came to the back of the truck and told him,

-6-

"[H]andle this sh-t." Evans testified, "I looked at him like what. And he was like kill that n-----." Evans said [the Petitioner] was walking toward him and reaching for [the Petitioner's] gun, so Evans walked to the front of the truck and started shooting. He said that he had "no choice" and that he fired nine or ten shots until the gun was empty. He said that he could have refused to shoot the victim but that "it happened so fast." He said that after the shooting, his conscience was bothering him because he had killed a man for no reason and that he could not eat, sleep, or stop moving. He said that he told the police he did not shoot the victim and that he lied because he was scared. He said that in a previous incident, [the Petitioner] told him to shoot at "some East Lake fellows." However, Evans was about fifty yards away when he shot at the men and did not hit any of them. He apologized to the victim's family.

On cross-examination, Evans testified that he became a Y.G. by "how I carry myself," by getting to meetings on time, and by being loyal to [the Petitioner]. He acknowledged that he was holding a bandana while he was loading the gun at Rooster's house and said that he loaded the weapon "after I had talked to them and realized that something was going on." However, he also said he "hadn't expected nothing to happen." He said that when the victim's truck arrived, [the Petitioner] and Sneed walked up to the driver's side while he stayed toward the back of the truck. He said [the Petitioner] walked toward him and told him, "[H]andle this sh-t Piru." He walked to the front of the truck and started shooting but did not wrap the gun in a red rag. After the shooting, he ran. When asked if he would have killed the victim if he had known the victim was Sneed's cousin, he said, "I really can't say."

Evans acknowledged that his attorney gave him a copy of Brock's statement and that he knew Brock was going to say Brock heard [the Petitioner] tell Evans to "handle that sh-t Piru." He acknowledged that he was not afraid of [the Petitioner] but said that he would kill for [the Petitioner] because he was loyal to [the Petitioner]. He said that he told the police [the Petitioner] killed the victim and that he blamed [the Petitioner] because he was afraid to admit he had killed someone. He said that he used the bandana to load the gun at Rooster's house because he did not want to get fingerprints on the bullets. However, he did not know he was going to shoot and kill anyone. He said the victim's death was not planned.

State v. Timothy Evans and Michael Daniels, No. E2009-01627-CCA-R3-CD, 2011 WL 3667722, at *1-9 (Tenn. Crim. App. Aug. 22, 2011), perm. app. denied (Tenn. Mar. 27, 2013).

Based on the above evidence, the jury convicted the Petitioner of first degree murder and conspiracy to commit first degree murder and acquitted him of carrying a dangerous weapon. Id. at *9. The trial court sentenced the Petitioner to consecutive terms of life and twenty-three years for his two convictions. On direct appeal, the Petitioner argued that: (1) the evidence was insufficient to support the convictions; (2) the trial court erred in denying his motion to sever; (3) the extreme security measures at trial prejudiced the defense; (4) the trial court erred in denying his motion for new trial after the State's gang expert lied about her credentials; (5) the trial court failed to properly redact his indictment; (6) the trial court failed to adequately control Darius Sneed while he was testifying; and (7) the cumulative effect of the errors warranted a new trial. This court affirmed the Petitioner's convictions. Id. at *1. After the post-conviction court granted a delayed appeal to the Tennessee Supreme Court, the Petitioner's Rule 11 application for permission to appeal was denied on March 27, 2013.

On March 22, 2012, the Petitioner filed a timely pro se petition for post-conviction relief, alleging, inter alia, twenty-four grounds of ineffective assistance of counsel. The Petitioner was subsequently appointed counsel, who filed two amended petitions on the Petitioner's behalf. The post-conviction hearing occurred on August 27, 2012.[1]

**Post-Conviction Hearing.** Trial counsel testified that he had been practicing criminal defense for eight years prior to being court-appointed to represent the Petitioner. He said he had previous trial experience in a gang-related first degree murder case. He characterized his relationship with the Petitioner as "rocky" at times but said that they generally "got along pretty well." Trial counsel stated that four or five attorneys had been appointed to the Petitioner before he took over the case. He said he visited the Petitioner thirty to fifty times while the Petitioner was in jail and that they communicated by mail and by phone. Trial counsel said the Petitioner asked him to withdraw at one point but then changed his mind.

Trial counsel testified that the State's theory of the case was that the Petitioner was the leader of the Skyline Bloods gang and that he ordered the killing of the victim. He said the strategy of the defense was to establish that the Petitioner did not have adequate rank or authority to order the shooting and that Evans acted alone. Trial counsel could not recall if he filed a motion in limine to exclude gang discussion from the trial. However, he did not believe that such a motion would have prevailed because "there really was no doubt that [the Petitioner] was in a gang." Trial counsel said that when the Petitioner was first arrested, he indicated in a phone conversation to the police, "'[Y]ou do your job, I'll do my job. I've got

---

[1] We only address the testimony from the hearing relevant to the issues that the Petitioner raised in his appellate brief. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

100 soldiers behind me.'" He stated that the Petitioner was also pictured on the front page of the local newspapers "throwing what appeared to be gang signs." Based on these factors and the Petitioner's "admitted involvement in a gang," trial counsel advised the Petitioner not to testify at trial unless he chose to do so. He said he began the case "assuming that [the Petitioner] was not a high ranking gang member" and that he had extensive discussions with the Petitioner about his status, Evans's status, and their relation to one another. Trial counsel denied that he essentially conceded to the State's theory of the case. He agreed that it was the State's burden of proof to establish the Petitioner's rank in the gang hierarchy.

Trial counsel said he had subpoenaed Officer Matthew Hennessy of the Chattanooga Police Department as a witness for the defense to discredit the State's gang expert, Investigator Christina Young. Based on a pre-trial phone conversation, he said Officer Hennessy had indicated that the Petitioner was actually a Y.G., or young gangster, as opposed to being a leader or other higher rank in the gang. Trial counsel agreed that Investigator Young testified before Officer Hennessy and that her testimony did not reference the Petitioner or his specific rank. He acknowledged that during his cross-examination of Officer Hennessy, his first question established the Petitioner's rank as a Y.G. On this issue, trial counsel stated:

> I established [the Petitioner's] rank as not a high ranking member of the gang. I knew that there was no way whatsoever I could establish him as a Baby Gangster or anything less than that. I did not want him to come out as appearing to be the head of Skyline Bloods, which is what was being alleged by the State. So to have him as a [Y.G.] as opposed to leader of the gang was obviously beneficial.

He agreed that when Evans's attorney cross-examined Officer Hennessy, the officer stated that the Petitioner was the leader of the Skyline Bloods. Trial counsel said this "was not what [they] had discussed on the phone." He acknowledged that this testimony was hearsay and that he did not object to this line of questioning. Because of the way the case was handled prior to his involvement, trial counsel did not think there would have been any benefit to file motions to exclude gang testimony.

Trial counsel recalled that several photographs were entered into evidence during the testimony of Investigator Young. He did not object to the admission of images of tattoos such as "Blood," "Killa," "South Side," and "Piru 43," because he did not want the jury to know that these were photographs of the Petitioner taken after his arrest. He also did not object to images of "a lot of individuals dressed in red throwing gang signs" because the photographs were confiscated from the Petitioner's house at the time of his arrest.

Trial counsel said he received Investigator Young's curriculum vitae (CV) from the State prior to trial. He opined that her CV was "impressive" and the parties and the trial court had assumed the CV was accurate. He recalled that Investigator Young testified about gangs for some time before she was qualified as an expert. Trial counsel said that if he had objected to her testimony, the State would have qualified her as an expert at that point. Prior to trial, the only investigation that trial counsel did regarding Investigator Young was to call Silverdale Detention Center to verify her employment. He acknowledged that in a separate case after the Petitioner's trial, two public defenders had contacted Cleveland State Community College and discovered that Investigator Young did not graduate from there. Trial counsel said he filed motions to have the testimony of Investigator Young stricken after he learned that she had lied on her CV. He included the issue in his motion for new trial. He stated that the CV was "rather long" and that "[he] could have called every single agency if [he] had the phone numbers and the ability to do so." He said that the trial court had ruled that despite the lack of a college degree, Investigator Young was still a gang expert based on her work experience and training.

Trial counsel agreed that multiple witnesses testified at trial about the Petitioner's alleged rank in the Skyline Bloods. He also acknowledged that a large part of the Petitioner's conviction was based on his gang affiliation. He elicited testimony from Officer Hennessy that the Petitioner was a Y.G. Trial counsel opined that Darius Sneed had personal knowledge of the Skyline Bloods' structure because Sneed personally knew the Petitioner and Evans. He did not recall objecting to Sneed's testimony about the Petitioner's rank. Trial counsel did not request a mistrial based on Sneed's antagonism during cross-examination because he felt that Sneed's outbursts discredited him as a witness. Trial counsel agreed that it would have been appropriate to object to the hearsay testimony of Delicia Woodruff when she stated that "the word on the street" was that the Petitioner outranked Evans. He said he also should have objected to the testimony of Lieutenant Edwin McPhearson when he stated that he thought the Petitioner was an O.G. based on "the word on the street."

On cross-examination, trial counsel stated that he provided the Petitioner with copies of every document received from the State in discovery. He and the Petitioner reviewed copies of the witness statements and the preliminary hearing transcripts together. He recalled receiving the Petitioner's recorded statement to the police in which the Petitioner told Investigator James Tate about being a member of the Skyline Bloods and having status within the gang. Trial counsel said he "absolutely" knew the State would use the Petitioner's statement at trial. He reiterated that his main goal was to minimize the Petitioner's rank in the gang because the Petitioner "held himself out to be a gang member both when arrested, during the preliminary hearing, [and] in his statement." Trial counsel agreed that apart from the recorded statement, the Petitioner also commented on his gang affiliation to Lieutenant

McPhearson. He acknowledged that co-defendant Evans testified at trial about being in a gang with the Petitioner. He said that "there was no possible way" that he could keep the Petitioner's gang involvement out of the trial and that his strategy was to establish that the Petitioner lacked the authority to order the murder.

The Petitioner testified that prior to trial counsel, he had multiple lawyers appointed to him who would withdraw "a couple of days later[.]" He said he never received any discovery materials from trial counsel and that he did not see photographs until they were shown at trial. He stated that trial counsel never sent him any documents. According to the Petitioner, trial counsel did not spend enough time with him to develop a working relationship. He said he was concerned about trial counsel's ability to handle the case and that he asked trial counsel to withdraw several times. The Petitioner stated that trial counsel told him it was best that he remain on the case and the Petitioner "left it at that."

The Petitioner believed that the extra security at his trial prejudiced his case. He said he did not speak to counsel during the trial. He stated that he noticed trial counsel "nodding off" during the jury instructions. He said that trial counsel told him not to testify because the prosecution would "eat [him] alive." He said that this statement "created fear" and he did not know it was his constitutional right to testify on his own behalf. The Petitioner recalled telling the trial court that he was not prejudiced in any way about testifying. He said he did not see trial counsel any more after the trial and that he "wasn't trying to see [trial counsel]." He identified a post-trial letter from counsel that stated the Petitioner was convicted for being in a gang. He said he did not expect "to be walking free" but that trial counsel failed to do his best and let the Petitioner down.

On cross-examination, the Petitioner recalled that the issue of the gang expert Christina Young was raised in his motion for new trial and on direct appeal. He said he had five attorneys prior to trial counsel. He testified that he did not have difficulties with these attorneys and that they withdrew before he even got to know them. The Petitioner acknowledged that he told the police that he was involved with the Skyline gang. He said he was a young gangster (Y.G.) at the time but that he was no longer a gang member. He agreed that Evans was also a member of Skyline. The Petitioner recalled stating "Skyline forever" when taken into custody but said that he has since matured.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. On May 29, 2013, the court entered a written order denying relief after the

Tennessee Supreme Court denied the Petitioner's delayed appeal.[2]  The Petitioner timely appealed the post-conviction court's order.

## ANALYSIS

On appeal, the Petitioner argues that trial counsel was ineffective because he conceded the State's theory of the case regarding the Petitioner's gang affiliation and because he failed to adequately investigate the background of the State's gang expert, Christina Young.  The State responds that the post-conviction court properly denied relief because the Petitioner failed to establish that he received ineffective assistance of counsel.  Upon review, we agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right.  T.C.A. § 40-30-103.  The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise.  When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve.  The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation marks and citations omitted).  "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence."  Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)).  Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it.  Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

---

[2] Previously, on November 17, 2011, the supreme court had dismissed the Petitioner's Rule 11 application for permission to appeal as untimely.  At the post-conviction hearing, trial counsel conceded that he erred in failing to file a timely appeal to the supreme court.  On September 24, 2012, the post-conviction court granted the Petitioner's claim for a delayed appeal to the supreme court and stayed the proceedings.  On March 27, 2013, the supreme court denied the Petitioner's Rule 11 application for permission to appeal.

<u>Vaughn</u> further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

<u>Vaughn</u>, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. <u>Id.</u> (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." <u>Goad v. State</u>, 938 S.W.2d 363, 370 (Tenn. 1996) (citing <u>Strickland</u>, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the evidence establishes that the attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." <u>Id.</u> at 369 (citing <u>Strickland</u>, 466 U.S. at 688; <u>Baxter</u>, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" <u>Id.</u> at 370 (quoting <u>Strickland</u>, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>State v. Burns</u>, 6 S.W.3d 453, 462 (Tenn. 1999) (citing <u>Strickland</u>, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." <u>Strickland</u>, 466 U.S. at 688-89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" <u>House v. State</u>, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting <u>Goad</u>, 938 S.W.2d at 369).

First, the Petitioner argues that trial counsel was ineffective because he "effectively conceded the State's theory of the case with respect to gang involvement[.]" In support of this claim, the Petitioner asserts that trial counsel should have filed pre-trial motions and objected to hearsay testimony at trial about the Petitioner's gang affiliation.[3] He contends that counsel's repeated failure to preclude the admission of inflammatory and prejudicial gang evidence "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

In its order denying relief, the post-conviction court specifically held that the Petitioner was not entitled to relief for trial counsel's failure to exclude evidence of gang affiliation through pre-trial motions and through contemporaneous objections at trial. The post-conviction court found "no clear and convincing evidence that any deficiency in counsel's performance in this respect was prejudicial." In support of this conclusion, the court noted that "criminal responsibility for the conduct of another does not necessarily depend on rank; peers can be criminally responsible for another's conduct." The post-conviction court further stated:

> [E]ven without the hearsay evidence about the [P]etitioner's rank, there is sufficient, non-hearsay evidence, including the [P]etitioner's own statements to the police, in which he casts himself in the roles of inquisitor and judge in his confrontation with the victim and confirms Off. Hennessy's testimony that he was a Y.G., to establish his criminal responsibility for the shooter's conduct.

We conclude that the record fully supports the post-conviction court's determination that the Petitioner failed to establish that trial counsel was ineffective for failing to exclude gang-related evidence. The Petitioner has made an insufficient showing that he suffered

---

[3] Specifically, the Petitioner alleges the following errors in his brief: (1) trial counsel failed to file motions to suppress excessive and unnecessary evidence of gang involvement; (2) counsel allowed the admission of photographs of the Petitioner's tattoos; (3) counsel did not object to the admission of photographs taken from the Petitioner's residence depicting other individuals dressed in red and displaying gang signs; (4) counsel allowed the admission of a letter allegedly written by the Petitioner containing the meaning of various gang terms; (5) counsel purposefully elicited testimony from Officer Hennessy regarding the Petitioner's rank in the Skyline Bloods; and (6) counsel failed to object to the hearsay testimony of five witnesses regarding the Petitioner's status and involvement in the Skyline Bloods (specifically: Frederico Brock, Officer Hennessy, Lieutenant McPhearson, Darius Sneed, and Delicia Woodruff). We do not need to address these alleged deficiencies because the Petitioner has failed to establish that he was prejudiced at trial because of these errors. See Goad, 938 S.W.2d at 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697). In any event, the trial transcript reflects that trial counsel vigorously cross-examined each of the witnesses regarding the Petitioner's alleged gang status.

prejudice due to counsel's alleged deficiencies. See Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Although he faults trial counsel for allowing the admission of various gang references, the Petitioner has not demonstrated how counsel's actions undermined the results of the trial or that the trial court would have ruled in the Petitioner's favor on evidentiary issues.

As an initial matter, we note that evidence of gang affiliation is "character evidence subject to Rule 404(b)." See State v. Orlando Crayton, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 27, 2001); State v. Ronald Eugene Brewer, Jr., No. E2010-01147-CCA-R3-CD, 2011 WL 2732566 (Tenn. Crim. App. July 14, 2011), perm. app. denied (Sept. 21, 2011). As such, gang-related evidence "may be relevant and admissible to prove issues such as identity, motive, opportunity, or absence of mistake or accident." See Tenn. R. Evid. 404(b). Here, the Petitioner's gang affiliation was relevant and admissible because it assisted the jury in identifying him as criminally responsible and established his motive for the offense. See Orlando Crayton, 2001 WL 720612, at *3-4. We cannot conclude that the probative value of the gang-related evidence was outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b). Moreover, the Petitioner's own statements about his gang status were admissible as hearsay exceptions. See Tenn. R. Evid. 803(1.2).

In addition, the record reflects that the Petitioner openly held himself to be a member with status in the Skyline Bloods gang. Lieutenant McPhearson testified that he spoke to the Petitioner over the phone prior to his arrest. When Lieutenant McPhearson asked the Petitioner to come to the police station, the Petitioner responded, "'I have a hundred soldiers standing behind me. Do your job. It's your job to find me. . . .You know who I am. I'm a killer. Do your job.'" Lieutenant McPhearson stated that when the Petitioner was taken into custody, he yelled out to the crowd, "'Skyline forever.'" The record further reflects that during his preliminary hearing, the Petitioner displayed gang signs in the courtroom. In his recorded statement to Investigator James Tate, which was played for the jury, the Petitioner said he was a Y.G. in the Skyline Bloods and that the victim was pleading for his life but that "it was too late." Finally, co-defendant Evans testified that the Petitioner started the Skyline Bloods in Chattanooga and that the Petitioner was the leader of the gang. Evans stated that he had "no choice" but to follow the Petitioner's orders. Because of the Petitioner's admitted gang involvement and how the case was handled prior to his representation, trial counsel testified that "there really was no doubt that [the Petitioner] was in a gang." Therefore, the theory of the defense was that the Petitioner lacked the authority to order the shooting. Despite the efforts of trial counsel, the jury accredited the testimony of the State's witnesses, and this court affirmed the Petitioner's convictions under a sufficiency of the evidence analysis on direct appeal. Timothy Evans and Michael Daniels, 2011 WL 3667722, at *10-11. Upon review, we agree with the post-conviction court that the Petitioner failed

to demonstrate that he was prejudiced by counsel's alleged evidentiary errors. Accordingly, he is not entitled to relief on this issue.

Next, the Petitioner contends that trial counsel was ineffective for failing to adequately investigate the background of the State's gang expert, Christina Young. He argues that trial counsel would have been able to challenge the witness's expertise and credibility if counsel had conducted an appropriate pre-trial investigation. The Petitioner asserts that he was prejudiced by this deficiency because Young's testimony "allowed the State to to build a case based upon [the Petitioner's] gang involvement[.]"

Initially, we note that trial counsel raised the issue of Young's veracity and expert qualifications in the Petitioner's motion for new trial and on direct appeal. In addressing the issue, this court stated in its opinion on direct appeal:

> At trial, Young testified for the State as an expert in gang investigations. During her testimony, she stated that she had an associate's degree in criminal justice and received some gang-related training while she was earning her degree. However, at the motion for new trial hearing, Young testified that she never received her degree and that she was no longer working for Silverdale Detention Center due to some "medical issues." She said that despite not having a college degree, "I felt like that my training would have qualified me on its own." In denying the [Petitioner and Evans's] motions for a new trial, the trial court stated that it was "appalled" Young lied about her credentials. However, the court ruled that it would have found Young to be an expert even if she had not testified about having a college degree. The trial court stated that it believed the rest of Young's trial testimony and noted that none of Young's testimony dealt specifically with the [Petitioner and Evans]. The trial court held that Young's perjury did not prejudice the [Petitioner and Evans].

Timothy Evans and Michael Daniels, 2011 WL 3667722, at *14. This court agreed with the trial court "that Young's false testimony did not affect the jury's verdict." In support of this conclusion, this court noted:

> Young truthfully testified at trial that she had "141 gang investigator school hours that are post-certified, police officer standardized training certifications," that she obtained her gang specialist certification in 2002, that she was certified in tattoo interpretation and graffiti deciphering, and that she had attended numerous anti-gang seminars and training. The trial court said that it would have found Young to be an expert even if she had not testified

-16-

about having a college degree. We note that Officer Matt Hennessy, who also testified for the State as a gang expert, stated on cross-examination that he knew Young "through doing gang investigations" and acknowledged that she was knowledgeable about gangs. We conclude that Young's false testimony about having a college degree did not affect the jury's verdict. Therefore, the [Petitioner and Evans] are not entitled to relief on this issue.

Id. In its written order denying relief, the post-conviction court found "that any deficiency in counsel's performance in this respect was not prejudicial."

We conclude that the post-conviction court properly denied relief on this issue. The Petitioner has failed to show that trial counsel's failure to investigate Young's educational background prejudiced the defense. "Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). Rule 702 of the Tennessee Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The witness's necessary expertise may be acquired through formal education or life experiences. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002) (citing Neil P. Cohen, Donald F. Paine, & Sarah Y. Sheppeard, Tennessee Law of Evidence § 7.02[4] at 7-21). However, the witness must possess such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise exceeds the scope of common knowledge and experience possessed by the average person. Id. Here, the trial court specifically concluded that Young's experience, knowledge, and training qualified her as an expert, despite her lack of a college degree. Furthermore, her expert testimony did not specifically mention the Petitioner. Additionally, there were multiple witnesses at trial who testified regarding the hierarchy of the gang as well as the Petitioner's leadership status. The Petitioner has not demonstrated that but for counsel's failure to discover Young's false testimony prior to trial, the outcome of the proceeding would have been different. Accordingly, the Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the record, we cannot conclude that the verdict in the Petitioner's trial was undermined or that the proceedings were fundamentally unfair because of the alleged errors of trial counsel. See Strickland, 466 U.S. at 670 ("[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."). Here, the

record fully supports the post-conviction court's holding that the Petitioner failed to establish his factual allegations by clear and convincing evidence. The Petitioner is not entitled to post-conviction relief, and the judgment of the post-conviction court is affirmed.

 

_____

CAMILLE R. McMULLEN, JUDGE